**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**J&J SPORTS PRODUCTIONS, INC.,**

    **Plaintiff,**

    v.                                                                                        Case Nos. 14-CV-101,
                                                                                                                       14-CV-103

**ANGEL GUTIERREZ GARNICA,
d/b/a TAQUERIA EL JALAPENO,**

    **Defendant.**

---

**DECISION AND ORDER FOLLOWING COURT TRIAL**

---

These are two actions under The Communications Act of 1934, as amended, 47 U.S.C. § 605, *et seq.*, and The Cable & Television Consumer Protection and Competition Act of 1992, as amended, 47 U.S.C. § 553, *et seq.* The plaintiff, J&J Sports Productions, Inc. ("J&J Sports") alleges that it was granted the right to distribute the *Manny Pacquiao v. Juan Manuel Marquez Welterweight Championship Fight Program*, including undercard bouts and the entire television broadcast, scheduled for December 8, 2012 (the "Broadcast"), via closed circuit television and via encrypted satellite signal. (Complaint ¶ 10, Docket # 1.) J&J Sports alleges that the defendant, Angel Gutierrez Garnica ("Garnica") d/b/a Taqueria El Jalapeno, unlawfully intercepted, received and/or de-scrambled the satellite signal and exhibited the Broadcast at his establishments located at 2222 South 13th Street and 2106 West National Avenue in Milwaukee, Wisconsin. (*Id.* ¶ 13.) Both establishments are called Taqueria El Jalapeno.

In its complaint, J&J Sports alleged violations of both § 605 and § 553 because it could not determine if the defendant intercepted the Broadcast via a cable system, in violation of 47 U.S.C. §

553, or via a satellite transmission, in violation of 47 U.S.C. § 605. However, J&J Sports also acknowledged that the defendant can only be liable under one of the statutes. (*Id.* ¶ 25.) At trial, in Case No. 14-CV-103, Garnica testified that he had a converter box and in Case No. 14-CV-101 that he used a computer. Because Garnica's testimony showed that the Broadcast was exhibited using a "placeshifting" device, J&J Sports argues that the Broadcast more likely originated from a cable source and thus will proceed under 47 U.S.C. § 553. (Docket # 27 at 2.) Consequently, I will dismiss count one of both complaints, brought under 47 U.S.C. § 605.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. Upon all parties consenting to the full jurisdiction of a magistrate judge, these cases were reassigned to this Court. A trial to the Court in both cases was held on December 1, 2014 and the Court ordered the parties to file post-trial submissions. The matter is now ready for resolution.

## FINDINGS OF FACT

On December 1, 2014, a trial to the Court was held in these matters. Michael J. Pfeifer ("Pfeifer"), an investigator, and the defendant, Garnica, testified at trial. Pfeifer's affidavits were entered into evidence as Exhibit 1 in both cases. Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact based on the evidence presented at trial.

J&J Sports was granted the right to distribute the *Manny Pacquiao v. Juan Manuel Marquez Welterweight Championship Fight Program*, including undercard bouts and the entire television broadcast, scheduled for December 8, 2012, via closed circuit television and via encrypted satellite signal. J&J Sports had agreements with various commercial entities throughout Wisconsin allowing them to publicly exhibit the Broadcast to their patrons. (Rate Card, Exhibit 2.) The Broadcast

originated via satellite uplink, and was subsequently re-transmitted to cable systems and satellite companies via satellite signal.

On December 8, 2012, Pfeifer, an investigator with Falcon Investigators, was investigating in the Greenfield Avenue/National Avenue area in Milwaukee after receiving a lead that a location in the area would be showing the Broadcast without having paid the proper fee. Pfeifer was investigating that location, as well as other locations in the area. At approximately 9:49 p.m., Pfeifer entered Taqueria El Jalapeno located at 2222 South 13th Street in Milwaukee, Wisconsin. Pfeifer did not pay a cover charge to enter this establishment. Pfeifer did not observe any advertising for the Broadcast prior to entering the establishment. Pfeifer ordered one drink from an adult female server.

Pfeifer observed three televisions in the establishment, all displaying the HBO pay-per-view fight broadcast from the MGM Grand Arena in Las Vegas, Nevada. Pfeifer observed the judges' decision of the bout between Filipino Gesta and Miguel Vazquez and the introduction of the boxers in the next bout between Michael Farenas and Yuri Gamboa. Pfeifer identified the fights shown as the pay-per-view fight because he received a listing in advance of the names of the boxers participating in the pay-per-view fight and matched those names to the names of the boxers shown on the television screen.

Pfeifer estimated the Taqueria El Jalapeno on South 13th Street's capacity was 44. During Pfeifer's time inside this establishment, he counted the number of patrons three separate times and the head counts were 31, 30, and 33. Pfeifer left the Taqueria El Jalapeno on South 13th Street at 10:12 p.m. and observed four vehicles in the parking lot.

At approximately 10:58 p.m. on December 8, 2012, Pfeifer entered the Taqueria El Jalapeno located at 2106 West National Avenue. Pfeifer did not pay a cover charge to enter this establishment.

Pfeifer ordered a Coca-Cola from an adult female server. Pfeifer observed two televisions in this establishment, all displaying the HBO pay-per-view fight broadcast from the MGM Grand Arena in Las Vegas, Nevada. Pfeifer observed a portion of the undercard bouts, specifically the seventh and eight rounds of the bout between Michael Farenas and Yuri Gamboa. Pfeifer estimated this establishment's capacity at 44. During Pfeifer's time inside the Taqueria El Jalapeno on West National Avenue, he counted the number of patrons three separate times and the head counts were 39, 39, and 41. Pfeifer left the Taqueria El Jalapeno on West National Avenue at 11:14 p.m. and observed three vehicles parked near the establishment, which did not have a dedicated parking lot.

## ANALYSIS AND CONCLUSIONS OF LAW

### 1. *Liability Under The Cable Act*

Section 553 of The Cable & Television Consumer Protection and Competition Act of 1992, as amended, 47 U.S. § 553, *et seq* (the "Cable Act") governs the interception of cable television programming traveling over a cable network. Any person aggrieved by a violation of the Cable Act has a right of action enforceable in federal court. § 553(c)(1). As in the present case, the statute is used by the owners of exclusive rights in closed-circuit boxing matches to recover damages from the owners of establishments that have broadcast such events without purchasing the right to do so. *See generally Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F. Supp. 2d 955 (E.D. Wis. 2001); *Joe Hand Promotions, Inc. v. Ewer*, No. 09–C–612, 2009 WL 3269658 (E.D. Wis. Oct. 8, 2009).

Section 553 states that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator . . . ." 47 U.S.C. § 553(a)(1). The court may award either actual damages or statutory damages. § 553(c)(3)(A). The latter may run from between $250 to $10,000 per violation.

§ 553(c)(3)(A)(ii). The damages award against any person violating § 553(a)(1) "willfully and for purposes of commercial advantage or private financial gain" may be increased by up to $50,000. § 553(c)(3)(B). "Willful" as used in this statute means a "disregard for the governing statute and an indifference for its requirements." *ON/TV v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985) (internal quotation marks omitted). However, in cases where the court finds that the violator "was not aware and had no reason to believe that his acts constituted a violation," the court may reduce the award of damages to a sum of not less than $100. § 553(c)(3)(C). Section 553 also provides that the court may award a plaintiff reasonable attorneys' fees. § 553(c)(2)(C).

The Cable Act does not require a defendant to have knowledge that his conduct amounted to a violation. *See International Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1004 (2d Cir. 1993) (finding that 47 U.S.C. § 553 does not exempt an unaware person from liability). In other words, the Cable Act is a strict liability statute. *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 275 (E.D. Pa. 2014) (stating that the statutory damages provision imposes strict liability). However, while a defendant's knowledge and intent have no bearing on the question of liability, knowledge and intent are relevant to the question of damages. 47 U.S.C. § 553(c)(3)(B); *see also* 47 U.S.C. § 553(c)(3)(C).

In this case, Garnica does not contest the strict liability required by the statute. Nor does Garnica deny that he violated the statute. At trial, Garnica testified that he was sorry, that it was the first time he had ever committed the offense, and that it would not happen again. Thus, based on the testimony of Pfeifer and Garnica, the evidence shows that Garnica displayed the Broadcast to patrons of his establishments without contractual authorization from J&J Sports. Accordingly, the Court finds, as a matter of law, that Garnica violated § 553(a)(1) of the Cable Act.

### 2. *Damages*

    i.    Statutory Damages

A party entitled to relief under the Cable Act may recover actual or statutory damages. § 553(c)(3)(A). J&J Sports requests statutory damages pursuant to § 553(c)(3)(A)(ii). As previously stated, § 553(c)(3)(A)(ii) states that "the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just." J&J Sports also requests "enhanced" damages pursuant to § 553(c)(3)(B), which states that "[i]n any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages . . . by an amount of not more than $50,000." The statute also provides that damages may be reduced to a sum of not less than $100 in any case where the court finds that the "violator was not aware and had no reason to believe that his acts constituted a violation of this section." § 553(c)(3)(C).

As a preliminary matter, I find that § 553(c)(3)(C) is not applicable. Garnica does not argue that he was not aware or had no reason to believe that his action constituted a violation. Garnica testified that he met a man from Chicago who offered to show the fight and that this man brought a computer into the establishment to show the fight. Garnica stated that he did not realize that he would get into trouble. He further testified that he was sorry, that it was the first time something like this ever happened, and that he would not do it again. Given Garnica's testimony that he allowed the fight to be broadcast to his patrons without paying a fee for the fight, I find that he had reason to believe that he was not authorized to display the fight to his patrons.

There is no established formula from the Seventh Circuit for calculating statutory damages under 47 U.S.C. § 553 and courts have taken a variety of approaches. *See Kingvision*, 146 F. Supp. 2d at 960 (explaining the various approaches used by courts for assessing statutory damages, including number of patrons and flat sum). One common approach is to assess $55 per patron. *See J&J Sports Productions, Inc. v. Homestyle Restaurant Group, LLC*, No. 13-CV-506, 2014 WL 4072132, *3 (E.D. Wis. Aug. 15, 2014) (collecting cases). However, as the court in *Homestyle Restaurant Group* noted, the $55 amount established in 1996 fails to adjust for inflation. *Id.* at *4. Further, in cases where the patron count is low, the $55 amount could yield a figure less than the minimum rate the defendant would have been charged had he purchased the event lawfully. *Id.* In cases such as these, courts have adjusted the statutory damages figure to the contract rate. *Id.*

In this case, the maximum capacity of the National Avenue location is 61 (Docket # 23-5) and the maximum capacity of the South 13th Street location is 80 (Docket # 23-6). Based on these capacities, the cost to obtain the Broadcast lawfully from J&J Sports would have been $2,200 for each location, totaling $4,400. (Rate Card, Exh. 2.) Pfeifer testified that there were between 30-33 patrons present at the 13th Street location and between 39-41 patrons present at the National Avenue location. Using the highest patron counts at both locations, employing the $55 per patron cost would yield damages of only $4,070, which is below the contract rate Garnica should have paid. However, if the 1996 $55 per person rate is adjusted for inflation for a violation occurring in 2012, *see* http://data.bls.gov/cgi-bin/cpicalc.pl?cost1=55.00&year1=1996&year2=2012 (last visited Jan. 20, 2015), the result would be an award of approximately $80 per patron, or $5,920.

J&J Sports argues that damages should be awarded not only to compensate it for the violations, but to serve as a deterrent against the defendant and other potential pirates. (Pl.'s Br. at

3, Docket # 27.) In cases where a per patron damage calculation yields an amount equal to or lower then the price of the broadcast, I agree that simply requiring a plaintiff to pay what he would have been required to pay had he acted lawfully is insufficient to deter piracy. *See Homestyle Restaurant Group*, 2014 WL 4072132 at *6. In this case, however, I find that awarding J&J Sports the $80 per patron amount, totaling $5,920, an amount greater than the $4,400 Garnica would have paid to legally broadcast the fight, sufficiently compensates the plaintiff for the violations and deters future piracy.

Finally, I find the evidence insufficient to establish that Garnica willfully violated the statute. Garnica did not advertise the fight, did not charge a premium for food or drinks, and did not charge a cover fee. Further, Garnica testified that this was his first violation and that he did not make much money that night. *See J&J Sports Prods., Inc. v. Broadway Baby of Wisconsin, Ind.*, No. 12-CV-405, 2013 WL 238850, *4 (E.D. Wis. Jan. 22, 2013) (considering the following factors in assessing enhanced damages: (1) the number of violations; (2) the defendant's unlawful monetary gains; (3) the plaintiff's significant actual damages; (4) whether the defendant advertised for the event; and (5) whether the defendant collected a cover charge on the night of the event). As Garnica's actions did not amount to willfulness, additional damages under § 553(c)(3)(B) are not appropriate.

    ii.  Attorneys' Fees and Costs

Section 553(c)(2)(C) also gives the court discretion to award the recovery of full costs, including reasonable attorneys' fees, to an aggrieved party who prevails. In this case, plaintiff requests $3,400 in attorneys' fees and costs. (Docket # 27-1.) This amount represents 10.4 hours of work at a rate of $250 per hour expended in the litigation of both cases through trial and the $400 filing fees in both cases. (*Id.*) Garnica does not challenge the attorney's fees sought by J&J Sports.

I find neither the attorney's rate nor his hours spent on this case unreasonable. Thus, I will award the plaintiff the sum of $3,400 in attorney's fees and costs.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Clerk of Court shall enter judgment in favor of the plaintiff and against the defendant, in the amount of $9,320 for statutory damages, attorneys' fees, and costs, pursuant to 47 U.S.C. § 553(c)(2)(C) and § 553(c)(3)(A)(ii).

**IT IS FURTHER ORDERED** that these actions be and hereby are dismissed.

Dated at Milwaukee, Wisconsin this 20th day of January, 2015.

BY THE COURT

s/*Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge